## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| John Vest, Margaret Culton, and William Yates, individually and as the representatives of a class of similarly situated persons, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 5:26-cv-4011 |
| v. | ) ) | Class Action |
| CVR Energy, Inc., CVR Partners, LP, Coffeyville Resources Nitrogen Fertilizers, LLC, Coffeyville Resources Refining & Marketing, LLC, | ) ) ) ) ) ) ) | **AMENDED COMPLAINT** |
| Defendants. | | |

## INTRODUCTION AND NATURE OF THE CASE

1.      This action arises from decades of systemic environmental abuse by CVR Energy, Inc., CVR Partners, LP, Coffeyville Resources Nitrogen Fertilizers, LLC, and Coffeyville Resources Refining & Marketing, LLC (collectively, "Defendants"), whose refinery and fertilizer facilities in Coffeyville, Kansas have exposed thousands of residents to constant and sustained hazardous air and water pollution, resulting in substantial health risks, environmental degradation, and significant interference with the enjoyment and use of private and public spaces.

2.      Plaintiffs bring this suit to seek compensatory and punitive damages for nuisance, as well as equitable relief in the form of injunctive measures to mitigate and prevent future harms and court-supervised medical monitoring.

3.      At the heart of this case is a story of corporate disregard for human life and ecological stability. While reaping billions in revenue, Defendants have inflicted unbearable noise, foul odors, and noxious fumes upon the neighboring community.

1

4.      The refinery and fertilizer facilities have amassed a lengthy history of regulatory violations under the Clean Air Act and Clean Water Act. Despite multiple government enforcement actions, consent decrees, and fines exceeding $30 million, Defendants have failed to mitigate the harmful emissions of the refinery and fertilizer facility.

5.      The refinery and fertilizer facility are located within a densely populated area that includes vulnerable communities. Nearly 10,000 people live within a 6-mile radius of the plants, including low-income households and a Cherokee Tribe community. An Early Childhood Learning Center sits less than a mile from the pollution sources.

6.      Despite entering into consent decrees with federal and state agencies in 2004, 2012, and most recently in 2023, Defendants have failed to address or remediate the full scope of the environmental devastation that they have inflicted on the communities surrounding the refinery and fertilizer facility.

7.      Defendants' environmental contamination has resulted in health issues, loss of community trust, and persistent fear among residents. On many surrounding properties, the combination of toxic emissions, property damage, odors, and continuous noise has made daily lives burdensome and at times unbearable.

8.      Plaintiffs seek injunctive relief and damages to compensate for this interference with their use and enjoyment of their property.

9.      Given the prolonged and repeated exposure of residents to known carcinogens and respiratory toxins, Plaintiffs request that the Court order the establishment of a funded medical monitoring program to detect, diagnose, and treat diseases arising from this exposure.

10.     Plaintiffs bring this action to compel the Defendants to finally address the harm they have inflicted upon the community surrounding the refinery and fertilizer facility and to ensure that future generations are not similarly burdened by preventable environmental injustice.

**PARTIES**

11.     Plaintiff John Vest is a resident of Coffeyville, Kansas.

12.     Plaintiff Margaret Culton is a resident of Coffeyville, Kansas.

13.     Plaintiff William Yates is a resident of Coffeyville, Kansas.

14.     Defendant CVR Energy, Inc. ("CVR Energy") is incorporated in Delaware and has its principal place of business in Texas. CVR Energy is a holding company engaged in the renewable fuels and petroleum refining market businesses as well as in the nitrogen fertilizer manufacturing industry. Billionaire investor Carl Icahn owns about 66% of CVR Energy through Icahn Enterprises L.P. and other affiliated entities.

15.     Defendant CVR Partners, LP ("CVR Partners" and together with CVR Energy, the "CVR Defendants") is a Delaware limited partnership, with its principal place of business in Texas. It was formed in 2011 by CVR Energy to own, operate, and grow its nitrogen fertilizer business. CVR Partners produces and distributes nitrogen fertilizer products at its manufacturing facility in Coffeyville, Kansas. As of December 31, 2024, CVR Energy had a 36.8% ownership stake in CVR Partners and is the sole member of CVR GP, LLC ("CVR GP"), the general partner of CVR Partners.

16.     Defendant Coffeyville Resources Nitrogen Fertilizers, LLC ("CRNF") is a limited liability company organized under the laws of Delaware, with its principal place of business in Texas. CRNF is a wholly owned subsidiary of CVR Partners. CRNF's sole member is CVR Partners. There are no other known members of CRNF. CRNF owns and operates the nitrogen

3

fertilizer manufacturing plant located at 701 East Martin Street in Coffeyville, Kansas. The facility utilizes a unique petroleum coke gasification process to produce hydrogen for use in the synthesis of ammonia and urea ammonium nitrate (UAN) fertilizers. CRNF is responsible for the day-to-day management and emissions of the fertilizer plant.

17.    Defendant Coffeyville Resources Refining & Marketing, LLC ("CRRM" and together with CRNF, the "Coffeyville Defendants") is a limited liability company organized under the laws of Delaware, with its principal place of business in Texas. It is an indirect wholly owned subsidiary of CVR Energy. CRRM's sole member is CVR Partners. There are no other known members of CRRM. CRRM owns and operates the Coffeyville Refinery located at 400 North Linden Street in Coffeyville, Kansas. The refinery processes up to 132,000 barrels of crude oil per day into gasoline, diesel, and other fuels.

## JURISDICTION

18.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because: (i) at least one Plaintiff is a citizen of a state different from the Defendants; and (ii) the amount in controversy exceeds $5,000,000, excluding interest and costs.

19.    This Court has personal jurisdiction over Defendants because they currently operate and conduct business within this District.

20.    Venue thus is proper in this district because the refinery and fertilizer facilities are located in Montgomery County and the acts complained of occurred in that county.

## FACTUAL ALLEGATIONS

**A.    The CVR Defendants Own, Operate, and Manage the Coffeyville Defendants**

21.    CVR Energy owns and controls CVR Partners and uses that ownership and control to operate and manage CVR Partners, CRNF, and CRRM. Any separation between the entities

exists on paper only; accordingly, the corporate veil between the CVR Energy, CVR Partners, CRNF, and CRRM[1] should be pierced and Defendants treated as one in this case.

22.    CVR Partners is the sole member of CRNF and CRRM. As CVR Energy's 2022 Form 10-K reveals, CVR Partners is managed by CVR GP's executive officers, who are themselves employed by and are a part of CVR Energy's senior management team. CVR Energy's 2024 Form 10-K confirms as much and provides that due to its "ownership" of CVR GP, CVR Energy directs and controls CVR Partners' management and business operations, including "the election and appointment of directors; business strategy and policies; mergers or other business combinations; acquisition or disposition of assets; future issuances of common units or other securities; incurrence of debt or obtaining other sources of financing; and the payment of distributions on our common units." Simply put, CVR Energy's ownership and control of CVR Partners gives it direct control over CRNF's and CRRM's business operations and management.

23.    CVR Energy's ownership and control of CRNF and CRRM is further underscored by the existence of overlapping personnel that perform various business operations and activities across the different entities. CVR Energy's 2024 Form 10-K describes a corporate structure whereby CVR Energy directly controls a wholly owned subsidiary named CVR Energy Holdings, Inc., which itself wholly owns CVR Services, LLC ("CVR Services"). Under a February 19, 2020 Corporate Master Service Agreement (the "Corporate MSA"), CVR Services provides operational and administrative services to CVR Energy, CVR Partners, CRNF, and CRRM, including the provision of personnel who perform core business functions across these entities. Per the Corporate MSA, these functions include, among other things, information technology,

---

[1] CRNF and CRRM are privately held, and publicly available information regarding their financial condition, corporate control, governance, and operational independence is limited.

accounting, investor relations, legal services, corporate compliance, business development, and oversight of environmental, health, safety, and security functions.

24.     The shared personnel provided through CVR Services use centralized systems across CVR Energy, CVR Partners, CRNF, CRRM to perform management, administrative, and operational tasks for CVR Energy, CVR Partners, CRNF, and CRRM, rather than being dedicated to any single entity. Moreover, as described in CVR Partners' 2025 Form 10-K, the Corporate MSA is one of several agreements involving CVR Energy, CVR Partners, CRNF, and/or CRRM that "were not the result of arm's-length negotiations" and the terms of which "are not necessarily at least as favorable to the parties to these agreements as terms which could have been obtained from unaffiliated third parties." Put simply, CVR Energy uses its control of CRNF and CRRM to cause those entities to enter into commercial contracts with and make payments to CVR Services (CVR Energy's wholly owned subsidiary) on terms that are less favorable than those CRNF and CRRM could have obtained elsewhere.

25.     Notably, the signatories to the Corporate MSA reveal how CVR Energy, CVR Partners, CRNF, and CRRM share the same employees and officers. Mark A. Pytosh signed the Corporate MSA as President & Chief Executive Officer of CVR Partners and as President & Chief Executive Officer of CRNF. Tracy D. Jackson signed the agreement as EVP & Chief Financial Officer of CVR Energy and also signed as the EVP & Chief Financial Officer of CRRM. This overlap of high-ranking corporate executives is yet another data point showing that CVR Energy and CVR Partners operate and manage CRNF and CRRM.

26.     CVR Partners is also responsible for certain of CRNF's debts, which further demonstrates the lack of corporate separateness between the entities in this case. CVR Energy's 2025 Form 10-K mentions certain commercial agreements CRNF entered into with third-parties and describes a financial guarantee of up to $45 million that CVR Partners issued to those third-

6

parties on behalf of CRNF. That 10-K report also confirms that CVR Partners' accounting would be impacted if it is required to honor the guarantee.

27.    Notwithstanding the (lack of) formal corporate structure, the CRNF fertilizer facility and the CRRM refinery operate in a physically and economically interdependent manner. For nearly two decades, CRNF has been contractually obligated to purchase petroleum coke produced by CRRM, up to 500,000 tons, pursuant to an internal pricing formula that sets the price at the lower of a calculation based on the fertilizer facility's profitability or an index-based price, with the option to purchase additional quantities above that amount.

28.    CVR Partners has publicly disclosed in its 2023 Form 10-K that it purchases all petroleum coke produced by CRRM and that any disruption in that supply would require CVR Partners to make purchases on the open market at potentially higher prices.

29.    The integration between CRNF and CRRM is further reflected in shared physical infrastructure. Under a February 19, 2020, Coffeyville Master Service Agreement (the "Coffeyville MSA") CRRM has granted CRNF a perpetual easement permitting CRNF to construct and operate a conveyor belt system for the transportation of petroleum coke from the refinery to the fertilizer facility, as well as easements for a coke haul road used for the same purpose. Under the Coffeyville MSA CRNF is also obligated to purchase a specified volume of hydrogen from CRRM pursuant to a separate internal agreement between the entities. This arrangement is fee-based and the price of hydrogen is determined pursuant to a contractual pricing structure rather than open-market transactions.

30.    The arrangements and corporate interdependence described herein suggest a substantial degree of operational integration between the CVR Energy, CVR Partners, CRNF, and CRRM. CVR Energy and CVR Partners (the parent entities) have effectively separated themselves from their subsidiaries, CRNF and CRRM, on paper while, in reality, they maintain

control over CRNF's and CRRM's business and operations. In doing so, CVR Energy and CVR Partners enjoy the benefits of the corporate form while side-stepping accountability for the harm they have wrought on the community. Allowing CVR Partners and CVR Energy to maintain the legal fiction of a separate corporate structure from CRNF and CRRM would therefore result in an injustice to Plaintiffs and the broader Coffeyville community.

### B.    The Coffeyville Refinery and Fertilizer Facility

31.    Defendants own and operate the Coffeyville Refinery, an oil refinery facility located at 400 N Linden, Coffeyville, Montgomery County, KS.  It was established in 1906 by the National Refining Company.  The Coffeyville Refinery produces approximately 2,100,000 gallons of gasoline and 1,700,000 gallons of middle distillates per day.  It is strategically located near one of the country's crude oil hubs in Cushing, OK.  It sells its outputs to customers inside and outside of Kansas and distributes them both through major pipelines and ground-based transportation.  The refinery is pictured here:



32. The EPA monitors and maintains data regarding facilities like the Coffeyville Refinery that emit pollutants into the air. The EPA has found that the Coffeyville Refinery has been emitting dangerous pollutants into the air since at least September 2000.

33. Moreover, according to the below screenshot from the EPA's Enforcement and Compliance History website, the agency concluded that "High Priority Violations" of the Clean Air Act ("CAA") had occurred at the Coffeyville Refinery in each quarter between March 2021 through December 2023.

| Statute | Program/Pollutant/Violation Type | | | QTR 1 | QTR 2 | QTR 3 | QTR 4 | QTR 5 | QTR 6 | QTR 7 | QTR 8 | QTR 9 | QTR 10 | QTR 11 | QTR 12+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CAA (Source ID: KS000002012500003) | | | 01/01-03/31/21 | 04/01-06/30/21 | 07/01-09/30/21 | 10/01-12/31/21 | 01/01-03/31/22 | 04/01-06/30/22 | 07/01-09/30/22 | 10/01-12/31/22 | 01/01-03/31/23 | 04/01-06/30/23 | 07/01-09/30/23 | 10/01-12/31/23 |
| | Facility-Level Status | | | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation |
| | HPV History | | | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA | Addressed-EPA |
| | Violation Type | Agency | Programs | Pollutants | | | | | | | | | | | | |
| CAA | HPV | EPA | CAANSPS, CAAPSD, CAASIP | TOTAL PARTICULATE MATTER, NITROGEN OXIDES NO2, Sulfur dioxide | 09/19/2000 | → | → | → | → | → | → | → | → | → | → | → |

34. Specifically, the EPA identified that the Coffeyville Refinery had been emitting at least the following pollutants: (1) particulate matter; (2) nitrogen oxides; and (3) sulfur dioxide.

35. A High Priority Violation is a violation of the CAA that is most likely to have significant adverse effects on human health and the environment. Indeed, High Priority Violations are the most severe category of violation of the CAA under the EPA's rubric.

36. There is a long and extensive history of state and federal enforcement actions against the Coffeyville Refinery for violations of the CAA.

37. First, in July 2004, CRRM entered into a consent decree with the EPA and the Kansas Department of Health and the Environment ("KDHE") to address air pollution and CAA violations at the Coffeyville Refinery that began in the 1990s. The consent decree required CRRM to implement extensive upgrades at the Coffeyville Refinery that were aimed at reducing emissions

9

(primarily of nitrogen oxides and sulfur dioxide) by over 1,750 tonnes per year.[2]

38.    Second, in March 2012, CRRM entered into a second consent decree with the EPA and KDHE, agreeing to pay a civil penalty of over $970,000 and committing over $4.25 million to new pollution control measures and $6.5 million for other measures to resolve violations of the CAA and other environmental protection laws.  The consent decree aimed to resolve violations regarding the Coffeyville Facility's emissions of sulfur dioxide, nitrogen oxides, volatile organic compounds, and benzene.[3]

39.    Third, in November 2023, CRRM entered into a third consent decree with the EPA and KDHE, committed to pay over $23 million to address CAA violations as well as violations of the 2012 consent decree.  Specifically, the consent decree mandated CRRM to pay more than $6.8 million in penalties for breaching the 2012 consent decree, plus over $6.2 million for additional CAA violations.  It also required CRRM to invest $1 million in a community-enriching environmental project, construct a $9 million flare gas recovery system minimize flaring, and to reduce nitrogen oxide emissions.  The consent decree was the result of years of investigations by federal and state regulatory authorities, which found that not only did CRRM fail to properly monitor its sulfur dioxide emissions from flaring (as it was required to do under the 2012 consent decree), but that it also committed several additional CAA violations which resulted in excess emissions of sulfur dioxide.[4]

40.    As the EPA explained when the 2023 consent decree was signed, CRRM's

---

[2] Consent Decree, *United States v. Coffeyville Res. Refining & Marketing, LLC*, No. 04-cv-1064, ECF No. 8 (D. Kan. July 13, 2004).

[3] Second Consent Decree, *United States v. Coffeyville Res. Refining & Marketing, LLC*, No. 04-cv-1064, ECF No. 12-1 (D. Kan. Mar. 6, 2012).

[4] Consent Decree, *United States v. Coffeyville Res. Refining & Marketing, LLC*, No. 04-cv-1064, ECF No. 156-1 (D. Kan. Nov. 20, 2023).

violations "illegal emissions of various pollutants, including an EPA estimate of over 2,300 excess tons of sulfur dioxide (SO2), a pollutant that can make breathing more difficult, from the refinery's flares from 2015 to 2017."[5]

41.      According to the EPA's data on aggregate emissions from the Coffeyville Refinery, following the consent decrees, the Coffeyville Refinery continued to release hundreds of thousands of pounds of "toxic," "critical," and "HAP"[6] air pollutants into the air.[7]

42.      Separately, Defendants own and operate the Nitrogen Fertilizer Facility, which is located adjacent to the Coffeyville Refinery at 701 E Martin, Coffeyville, Montgomery County, KS.  The Nitrogen Fertilizer Facility primarily produces ammonia and urea ammonium nitrate fertilizers, and uses petroleum coke from the neighboring refinery during its production processes.

43.       Like the Coffeyville Refinery, the Fertilizer Facility also emits toxic chemicals and has been subject to fines by the government enforcement entities for noncompliance with environmental laws and regulations.  Specifically, the CRNF paid the state a $100,000 fine in 2019 and a $4,000 fine in 2020 for violations of the CAA.[8]

44.      Between 2015 and 2024, the Fertilizer Facility has released in aggregate hundreds of thousands of pounds of "toxic," "critical," and "HAP" air pollutants into the air.[9]

---

[5] U.S. Environmental Protection Agency, *Coffeyville Resources Refining & Marketing Will Pay Over $23M to Address Clean Air Act Violations and Offset Environmental Harm Related to Its Kansas Refinery*, Nov. 20, 2023 https://www.epa.gov/newsreleases/coffeyville-resources-refining-marketing-will-pay-over-23m-address-clean-air-act.

[6] HAP means hazardous air pollutants. https://www.epa.gov/haps.

[7] U.S. Envtl. Prot. Agency, *Air Pollutant Report: Facility FID 110013703206*, ECHO https://echo.epa.gov/air-pollutant-report?fid=110013703206.

[8] U.S. Envtl. Prot. Agency, *Enforcement Case Report: Activity ID 3601996291*, ECHO https://echo.epa.gov/enforcement-case-report?activity_id=3601996291; U.S. Envtl. Prot. Agency, *Enforcement Case Report: Activity ID 3602108850*, ECHO,https://echo.epa.gov/enforcement-case-report?activity_id=3602108850.

[9] U.S. Envtl. Prot. Agency, *Air Pollutant Report: Facility FID 110000579856*, ECHO, https://echo.epa.gov/air-pollutant-report?fid=110000579856.

45.     The EPA's Toxic Release Inventory ("TRI") sheds further light on Defendants' emissions.  It is a public database that details annual releases of specific toxic chemicals to the air, water and land or managed as waste by industrial and federal facilities in the US.  TRI focuses on chemicals known to cause cancer, chronic or acute health issues or environmental harm, and helps assess potential risks to human health and the environment. Facilities that meet chemical threshold criteria (such as using chemicals in amounts above established levels), must annually report to the TRI program.

46.     To gauge the harm of TRI chemicals in the environment, the EPA uses the RSEI tool (Risk-Screening Environmental Indicators). The EPA's RSEI score is a relative measure that helps understand potential health impacts from chemical releases. It considers the size of the chemical release, how the chemical behaves in the environment, the size and location of the potentially exposed population, and the relative toxicity of the chemical. The score is calculated by multiplying the chemical toxicity weight, the estimated dose, and the potentially exposed population. Under this assessment, the higher the RSEI score, the higher the relative level of potential harm, as compared to other facilities.

47.     The TRI ID for the Coffeyville Refinery is 67337FRMLNNORTH, and the ID for the Nitrogen Fertilizer Facility is 67337FRMLN701EN. According to the TRI data summary for 2013 to 2022, the refinery had a total release of 2,971,521 pounds and a total waste managed of 705,200,972 pounds. Meanwhile, the Nitrogen Fertilizer Plant had a total release of 7,117,518 pounds and a total waste managed of 434,104,711 pounds.

48.     There are 9 TRI reporting facilities in Coffeyville and a total of 14 in Montgomery County. Notably, the Nitrogen Fertilizer Facility is ranked highest in TRI releases and RSEI score in the county, while the Coffeyville Refinery is ranked second highest in releases and third highest

in its RSEI Score in the county. Together, these two facilities are responsible for 90% of all TRI releases in the entire county.

49.     Indeed, as can be seen from the below screenshot from the EPA's RSEI web dashboard [10] ("RSEI Dashboard"), the Coffeyville Refinery RSEI Score is higher than the industry, county, state and US median scores.



| Year | Facility Score | Industry Median (Petroleum Refineries) | County Median (MONTGOMERY) | State Median (KS) | U.S. Median |
|---|---|---|---|---|---|
| 2012 | 18,591 | 12,912 | 9 | 35 | 20 |
| 2013 | 21,235 | 10,666 | 10 | 20 | 17 |
| 2014 | 23,413 | 11,625 | 13 | 34 | 17 |
| 2015 | 25,366 | 9,710 | 45 | 31 | 16 |
| 2016 | 16,347 | 9,123 | 12 | 29 | 15 |
| 2017 | 19,796 | 8,627 | 5 | 12 | 15 |
| 2018 | 17,035 | 9,596 | 91 | 11 | 15 |
| 2019 | 24,199 | 8,278 | 81 | 11 | 14 |
| 2020 | 21,280 | 8,041 | 65 | 9 | 13 |
| 2021 | 51,252 | 6,798 | 27 | 10 | 14 |

50.     Similarly, as can be seen in the below screenshot from the RSEI Dashboard, the Nitrogen Fertilizer Facility's RSEI score is even higher than that of the refinery and significantly higher than the industry, county, state and US median scores.[11]

---

[10] The RSEI web dashboard is a web interface that allows access to EPA Risk Screening Indicators data including graphs and charts. Data can be filtered by EPA region, state, year, industry and other groupings. https://www.epa.gov/rsei/easyrsei-basics?utm_source=chatgpt.com

[11] U.S. Environmental Protection Agency, *Envirofacts – Risk-Screening Environmental Indicators (RSEI) Facility Profile*, Facility ID 67337FRMLN701EN, https://enviro.epa.gov/envirofacts/tri/rsei?facid=67337FRMLN701EN



| Year | Facility Score | Industry Median (Petroleum Refineries) | County Median (MONTGOMERY) | State Median (KS) | U.S. Median |
|------|---------------|-----------------------------------------|-----------------------------|--------------------|--------------|
| 2012 | 18,591 | 12,912 | 9 | 35 | 20 |
| 2013 | 21,235 | 10,666 | 10 | 20 | 17 |
| 2014 | 23,413 | 11,625 | 13 | 34 | 17 |
| 2015 | 25,366 | 9,710 | 45 | 31 | 16 |
| 2016 | 16,347 | 9,123 | 12 | 29 | 15 |
| 2017 | 19,796 | 8,627 | 5 | 12 | 15 |
| 2018 | 17,035 | 9,596 | 91 | 11 | 15 |
| 2019 | 24,199 | 8,278 | 81 | 11 | 14 |
| 2020 | 21,280 | 8,041 | 65 | 9 | 13 |
| 2021 | 51,252 | 6,798 | 27 | 10 | 14 |

51.     As can be seen from the below screenshot from the EPA's TRI Toxics tracker[12] ("Toxic Tracker"), the highest RSEI Hazard score for Chemicals in Montgomery County are attributed to the Nitrogen Fertilizer Facility and the Coffeyville Refinery. Indeed, these two facilities generate RSEI Hazard scores that exceed those of all other facilities in the county by several orders of magnitude. Their contributions so thoroughly dominate the county's overall hazard profile that the remaining facilities register as statistically insignificant in comparison.

---

[12] The TRI Toxics tracker is a tool that allows website users to "access nonwide TRI data from the past 10 years and easily explore by geography, facility, industry, chemical, or specific data elements.



52.     According to data available on the Toxic Tracker, between 2012 and 2021, the two facilities released 3,945,402 pounds of ammonia into the Coffeyville air and water, with 76% of these emissions deriving from the Nitrogen Fertilizer Facility.

53.     In addition, as detailed in the Toxic Tracker screenshot below, the Coffeyville Refinery is responsible for 99% of BTEX[13] Chemical emissions in Montgomery County. Combined with the Nitrogen Fertilizer Plant's emissions, this amounts to 317,431 TRI pounds released in 2012 to 2021. The facility ranked second in emissions of BTEX emissions in the county is the Textron Aviation Facility in Independence, Montgomery County - approximately 17 miles from the Coffeyville Refinery and Nitrogen Fertilizer Facility.  The latter facility has an RSEI score of 415 compared to above 2 million from the Coffeyville Refinery.

---

[13] BTEX refers to the toxic compounds benzene, toluene, ethylbenzene and xylene - clear, colorless and highly flammable liquids found in petroleum and petroleum products. These compounds are often found in the air, water and soil surrounding petroleum deposits and refineries.



54.     As can be seen in the below screenshot from the Toxics Tracker the overwhelming majority of air pollution in and around Coffeyville is attributable to Defendants' facilities. EPA's TRI program monitors a total of nine facilities in Coffeyville. The Coffeyville Refinery and the Nitrogen Fertilizer Facility are responsible for the vast majority of emissions in Coffeyville and Montgomery County, rendering the emissions from the remaining reporting facilities negligible in comparison.

| TRI Facility | Releases (lb) | Releases (lb) |
|---|---|---|
| Totals | 11,140,520 | 11,140,520 |
| COFFEYVILLE RESOURCES NITROGEN FERTILIZERS LLC - 67337FRMLN701EN | 7,117,518 | |
| COFFEYVILLE RESOURCES REFINING & MARKETING - 67337FRMLNNORTH | 2,971,521 | |
| TESSENDERLO KERLEY INC. - 67337TSSND515NL | 733,505 | |
| ACME FOUNDRY INC - 67337CMFND1502S | 199,068 | |
| EMERALD TRANSFORMER PPM LLC - 67337SFTYKHWY16 | 77,281 | |
| JOHN DEERE COFFEYVILLE WORKS A DIV OF DEERE & COMPAN - 67337FNKMNHWY16 | 25,788 | |
| SOUTHWIRE CO COFFEYVILLE PLANT - 67337MRCNN3297N | 15,840 | |
| SP FOUNDRY - 67337JNSNM14THP | 0 | |
| SP FOUNDRY - 74072JNCST4THOS | 0 | |

55.     Furthermore, the below screenshot from the Toxic Tracker shows a map of Coffeyville which highlights the facilities monitored by TRI. The larger the mark around the

facility, the higher the potential health risk posed by that facility's emissions. The largest mark on the map is the Nitrogen Fertilizer Facility.



56.     In short, the Coffeyville Refinery and the Nitrogen Fertilizer Facility are serial polluters that have previously, and continue to, emit large amounts of harmful chemicals into the air.

**C.      The Devastating Health and Quality of Life Effects of Defendants' Emissions**

57.     The pollutants that Defendants emit can and have had devastating health and quality of life consequences.

58.     BTEX compounds (released by both facilities) are known to have adverse health effects, including harm to bone marrow, the central nervous system and the immune system. In

addition, exposure to high levels of BTEX can irritate the skin, eyes, nose and throat.[14] These chemicals also can cause cancer, neurological, developmental, reproductive and respiratory effects. Benzene specifically is a known carcinogen and has been linked to lung cancer, leukemia and Non-Hodgkin Lymphoma.[15] It may also cause genetic defects and infertility. [16]

59.     Particulate matter (emitted by the Coffeyville Refinery) is a mixture of solid particles and liquid droplets found in the air. These fine inhalable particles, typically 2.5 micrometers or smaller, originate from sources like dust, soot, smoke, and liquid droplets. PM 2.5 is particularly hazardous to health, capable of deeply penetrating the lungs. Prolonged exposure to PM 2.5 can lead to diminished lung function and heightened mortality risks from heart disease and lung cancer.[17]

60.     In addition, particulates damage property by soiling painted surfaces, fabrics, and buildings. Because of their abrasive nature, they can damage exposed surfaces when driven by high winds. Additionally, particulates, either through their own corrosiveness properties or when

---

[14] Pa. Dep't of Health, *Benzene, Toluene, Ethylbenzene & Xylenes – "BTEX"* (Aug. 2023), https://www.pa.gov/content/dam/copapwp-pagov/en/health/documents/topics/documents/environmental-health/BTEX.pdf.

[15] Gilda Alves, Rodolfo Acatauassú Nunes, Karina Melo & Maria Helena Faria Ornellas, *Tumors Due to Chronic Exposure to Benzene and Biomarkers of Exposure*, 8 J. Cancer Metastasis & Treat. 20 (2022), https://benzeno.ensp.fiocruz.br/sites/default/files/gilda_a_nunes_ra_melo_k_ornellas_mhf_2022_tumors_due_to_chronic_exposure_to_benzene_and_biomarkers_of_exposure.pdf.

[16] U.S.-based Chemwatch, *Benzene, toluene, ethylbenzene, and xylene: What are the harms of BTEX chemicals?* (Feb. 15, 2023), https://chemwatch.net/blog/benzene-toluene-ethylbenzene-and-xylene-what-are-the-harms-of-btex-chemicals/.

[17] U.S. Envtl. Prot. Agency, *Health and Environmental Effects of Particulate Matter* (May 23, 2025), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (health effects include "premature death in people with heart or lung disease; nonfatal heart attacks; irregular heartbeat; aggravated asthma; decreased lung function; increased respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing.").

present with sulfur dioxide and moisture, accelerate the corrosion of metals such as steel, copper, and zinc.[18]

61.    Ammonia (released by both facilities) is a toxicant derived from wastes, fertilizers and natural processes. Exposure to ammonia presents varying health risks depending on the concentration and duration of exposure. Short-term exposure to high concentrations can cause severe respiratory irritation, burns, and even fatal outcomes, while long-term exposure at high levels is linked to chronic respiratory diseases such as bronchitis and asthma-like symptoms, as well as a significant reduction in lung function.[19] Furthermore, Ammonia, in the form of gas characteristically has a "pungent odor."[20]

62.    Sulfur dioxide (emitted by the Coffeyville Refinery) is a colorless, pungent gas, which primarily comes from burning sulfur-rich fuels in power plants, industries, vehicles, and metal production, as well as from natural sources like volcanoes and biomass burning. It poses significant health risks, particularly causing respiratory irritation, wheezing, and shortness of breath, and is especially harmful to individuals with asthma. The EPA has stated that high concentrations of sulfur dioxide can impair breathing and exacerbate existing respiratory and cardiovascular diseases.[21]

---

[18] N. Venkat Rao et al., Detrimental Effect of Air Pollution, Corrosion on Building Materials and Historical Structures, 3 Am. J. Eng'g Rsch. 359 (2014).

[19] Neghab M *et. al*, *Ventilatory disorders associated with occupational inhalation exposure to nitrogen trihydride (ammonia)*. Industrial Health (2018). https://pmc.ncbi.nlm.nih.gov/articles/PMC6172184/.

[20] U.S. Environmental Protection Agency. Ammonia. https://www.epa.gov/caddis/ammonia

[21] U.S. Envtl. Prot. Agency, Coffeyville Resources Refining & Marketing LLC Will Pay Over $23 M to Address Clean Air Act Violations and Offset Environmental Harm Related to Its Kansas Refinery (Nov. 20, 2023). https://www.epa.gov/enforcement/coffeyville-resources-refining-marketing-settlement#health.

63.    Nitrogen oxides (emitted by the Coffeyville Refinery) represent a category of highly reactive gases, predominantly emitted into the air through fuel combustion. These gases significantly contribute to the formation of ozone in the atmosphere. Long-term exposure to nitrogen oxides can have severe health effects, potentially leading to chronic lung diseases and contributing to the development of asthma, with children, the elderly, and individuals with pre-existing asthma being particularly susceptible.[22]

64.    Beyond their direct impacts on human health, sulfur dioxide and nitrogen dioxide are well-documented causes of significant and costly damage to building materials. As one study explains, "the effect of corrosion due to acidic deposition costs a lot. Especially the effect of sulfur dioxide and nitrogen dioxide emissions is very much significant."[23]

65.    In addition, sulfur dioxide is known to damage vegetation. The Missouri Botanical Garden notes that sulfur dioxide interferes with photosynthesis and energy metabolism, and that it causes acute foliar injury ranging from bleached interveinal areas to necrotic spotting depending on species sensitivity.[24]

---

[22] U.S. Envtl. Prot. Agency, *Basic Information about NO₂* (last updated July 10, 2025) https://www.epa.gov/no2-pollution/basic-information-about-no2#What%20is%20NO2 ("Breathing air with a high concentration of NO2 can irritate airways in the human respiratory system. Such exposures over short periods can aggravate respiratory diseases, particularly asthma, leading to respiratory symptoms (such as coughing, wheezing or difficulty breathing), hospital admissions and visits to emergency rooms. Longer exposures to elevated concentrations of NO2 may contribute to the development of asthma and potentially increase susceptibility to respiratory infections. People with asthma, as well as children and the elderly are generally at greater risk for the health effects of NO2.").

[23] N. Venkat Rao et al., Detrimental Effect of Air Pollution, Corrosion on Building Materials and Historical Structures, 3 Am. J. Eng'g Rsch. 359 (2014).

[24] Missouri Botanical Garden, Sulfur Dioxide Damage to Plants. https://www.missouribotanicalgarden.org/gardens-gardening/your-garden/help-for-the-home-gardener/advice-tips-resources/insects-pests-and-problems/environmental/sulfur-dioxide

66.     Nitrogen oxides and sulfur dioxide also play a role in the formation of smog and acid rain leading to wider environmental and health consequences. Indeed, acid rain can damage manmade structures by causing damage to materials that need to be repaired or replaced. Acid rain also hurts vegetation. In particular, it strips essential nutrients from the soil and foliage, while releasing harmful aluminum, leaving trees weak, discolored, and unable to grow properly. As their leaves and needles deteriorate, the trees lose the ability to absorb sunlight and withstand environmental stress, ultimately causing widespread damage and death.[25]

67.     Around 10,000 individuals live within a 6-mile radius of the Defendants' facilities, where there are about 4,815 residential properties. Of this population, 57% are identified as belonging to low-income households.  Notably, there also is an early learning center serving preschoolers located just over 2 miles away from the facilities.

68.     Defendants' rampant and constant air pollution has had devastating effects on the community near their facilities, as detailed below.

69.     **Cancer:**  The chart below compares the age-adjusted cancer mortality rate per 100,000 population of Kansas overall and Montgomery County (where the facilities are located):[26]

| Years | Kansas (Overall) | Montgomery County | % Higher in Montgomery County Compared to Kansas (Overall) |
|---|---|---|---|
| 2017-2019 | 152.9 | 167 | 9.2% |
| 2018-2020 | 151.4 | 156.4 | 3.3% |
| 2019-2021 | 149.7 | 150.5 | .5% |

[25] U.S. Envtl. Prot. Agency, Effects of Acid Rain on Ecosystems, https://www.epa.gov/acidrain/effects-acid-rain

[26] Data derived from Kentucky Health Matters, *Age-adjusted Cancer Mortality Rate per 100,000 population* (county), Kansas Health Matters, https://www.kansashealthmatters.org/indicators/index/view?indicatorId=1333&localeId=1002

| 2020-2022 | 148.3 | 169.5 | 14.2% |
| 2021-2023 | 147.4 | 167.6 | 13.7% |

70.     Moreover, according to the most recent data (2014-2018), lung and bronchus cancer rates were 14.07% higher in Montgomery County compared to Kansas overall.

71.     **Respiratory Illness**:  The table[27] below compares the age-adjusted chronic lower respiratory disease mortality rate per 100,000 population of Kansas overall and Montgomery County (where the facilities are located):

| Years | Kansas (Overall) | Montgomery County | % Higher in Montgomery County Compared to Kansas (Overall) |
| --- | --- | --- | --- |
| 2019-2021 | 44.2 | 45.4 | 2.7% |
| 2020-2022 | 43 | 54.5 | 26.7% |
| 2021-2023 | 42.2 | 53.7 | 27.2% |

72.     As to asthma, in 2021, 13.2% of the adult population on Coffeyville's census tract was diagnosed with asthma, which is materially higher than the percentages both for Kansas overall (9.7%) and Montgomery County (10.5%).  This ranking places Coffeyville among the 25% worst cities for asthma in the United States and in Kansas.  The same goes for COPD – rates of the disease in adults in Coffeyville's census track were 14.3% in 2021, compared to 9% in Montgomery County and 6.4% nationally.

73.     Other reports confirm the dim health prospects for those who live in Montgomery County.  One study showed that the age-adjusted chronic lower respiratory disease mortality rate

---

[27] Id.

per 100,000 between 2018-2020 was 61.8% higher in Montgomery County compared to Kansas overall.  It also showed that life expectancy in Montgomery County between 2017-2019 was 74.9, while the overall life expectancy in Kansas was 77.6.[28]

### D.    Plaintiffs' Experiences in Coffeyville

74.    Plaintiff William Yates lives within several miles from the Defendants' facilities. He has lived there for 51 years. He often has seen yellow/orange or black smoke coming from the Coffeyville Refinery. The Defendants' emissions have interfered, and continue to interfere, with the enjoyment and use of his property.  Specifically, flares coming from the Coffeyville Refinery "burn so bright at night that it made it look like the sun was coming up."  Noise from the Coffeyville Refinery is also so loud and invasive that it "sounds like a jet aircraft taking off."  The emissions from the Coffeyville Refinery at times cause his nose to burn when he breathes.

75.    Plaintiff John Vest lives within several miles of Defendants' facilities. Defendants' emissions have interfered with the enjoyment and use of his property, resulting in black spots all over his cars and his house roof. He is exposed to the smell of "sulfur and rotten eggs".

76.    Plaintiff Margaret Culton resides a few miles from Defendants' facilities. The Defendants' emissions have interfered with the enjoyment and use of her property. Defendants' pollutants caused her car paint to peel. Defendants' emissions also caused her to suffer from dizzy spells and headaches.

## CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

---

[28] Coffeyville Regional Medical Center, *2022 Community Health Needs Assessment: FINAL* (Nov. 17, 2022) https://www.crmcinc.org/wp-content/uploads/2022/11/2022CHNA_Coffeyville_FINAL_111722.pdf.

78.     The Plaintiffs seeks to represent a class of individuals defined as follows:

> All persons who own real property within 6 miles of Defendants' facilities in 400 North Linden Street and 701 East Martin Street in Coffeyville, Kansas., or who live and keep personal property within 6 miles of Defendants' facilities.

79.     Excluded from the class are Defendants, their officers, directors, shareholders, members, managers, employees, attorneys (and attorney family members), and members of the federal judiciary. Plaintiffs reserve the right to amend the Class definitions upon completion of class discovery when the contours and the parameters of the Classes become more apparent.

80.     **Numerosity (Fed. R. Civ. P 23(a)(1))**. The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs, it is estimated that the population in the 6-Mile Radius around the facility is close to 10,000 persons,

81.     **Commonality (Fed. R. Civ. P. 23(a)(2))**. Many common questions of law and fact that exist as to Plaintiffs and members of the Class, and those questions substantially predominate over any questions that may affect individual Class Members. Common questions of fact and law include, but are not limited to:

a.  whether the pollution by Defendants interferes with Plaintiffs' reasonable use and enjoyment of their real estate and personal property;

b.  whether the Defendants owed a general duty to exercise reasonable care in preventing foreseeable harm to Plaintiffs;

c.  whether the seriousness of the harm Defendants caused Plaintiffs outweighs any public benefit that Defendants may provide; and

d.  whether Plaintiffs and Class Members are entitled to monetary relief and injunctive relief as requested.

24

    i.  Plaintiffs and the members of the Class have a commonality of interest in the subject matter of the lawsuit and remedies sought.

82. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the class sustained injuries from the same actions and inactions by Defendants which created and permitted a condition that was injurious to health, offensive to the senses, and interfered with the comfortable enjoyment of life and property.

83. **Injunctive and/or Declaratory Relief.** As demonstrated above, Defendants have acted on grounds generally applicable to the proposed Class such that final injunctive relief is appropriate with respect to the Class whole.

84. **Fair and Adequate Representation (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs will fairly and adequately protect the interests of the members of their Class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide, and Plaintiffs have no interest adverse to any member of the Classes. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and their Class.

85. **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

    a.  Proof of Defendants' liability on Plaintiffs' claims will also prove liability for the claims of the Class without the need for separate or individualized proceedings;

    b.  Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from Defendants' records and will not require individualized or separate inquiries or proceedings;

c.  Defendants have acted and are continuing to act pursuant to common practices in the same or similar manner with respect to all Class Members;

d.  The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs, without the risk of inconsistent judgments; and

e.  This case is inherently manageable as a class action in that:

   i.  Liability and damages can be established for Plaintiffs and the Class with the same common proof;

   ii.  A class action will result in an orderly and expeditious administration of claims, and it will foster economics of time, effort, and expense;

   iii.  A class action will contribute to uniformity of decisions concerning Defendants' practices; and

   iv.  As a practical matter, the claims of the Class are likely to go unaddressed absent class certification.

## COUNT I – PRIVATE NUISANCE
(against all defendants)

86.  All previous paragraphs are incorporated into this count.

87.  Plaintiffs are currently, and at all times relevant to this action were, the owners,

26

tenants, and/or lawful occupiers of real property located in and around Coffeyville, Kansas, within the area affected by Defendants' emissions.

88.    Defendants' actions and inactions created and permitted a condition that was injurious to health, offensive to the senses, and interfered with the comfortable enjoyment of life and property. Specifically, Defendants' operations emitted and continue to emit noxious odors, toxic fumes, and airborne pollutants into the surrounding community.

89.    As a result of Defendants' conduct, Plaintiffs have been continually exposed to toxic air pollution, which has caused and continues to cause breathing difficulties, burning of the eyes and throat, headaches, fatigue, and increased risk of cancer and respiratory illness.

90.    Plaintiffs cannot open their windows or spend time outdoors without suffering exposure to these pollutants and foul odors.

91.    The presence of these pollutants and odors has substantially interfered with Plaintiffs' quiet use and enjoyment of their properties, causing discomfort, emotional distress, and a decline in property value.

92.    Plaintiffs did not consent to Defendants' emissions or to the invasion of their properties by pollutants and odors.

93.    An ordinary person would be reasonably annoyed and disturbed by such conditions.

94.    Defendants' actions and inactions were a substantial factor in causing Plaintiffs' harm, including property damage, physical injury, mental anguish, loss of quiet enjoyment, and emotional distress.

95.    The seriousness of the harm Defendants caused Plaintiffs outweighs any public benefit that Defendants may provide.

27

## COUNT II – PUBLIC NUISANCE
(against all defendants)

96.     All previous paragraphs are incorporated into this count.

97.     Plaintiffs are currently, and at all times relevant to this action were, the owners, tenants, and/or lawful occupiers of real property located in and around Coffeyville, Kansas, within the area affected by Defendants' emissions.

98.     Defendants' actions and inactions created and permitted a condition that was injurious to health, offensive to the senses, and interfered with the comfortable enjoyment of life and property. Specifically, Defendants' operations emitted and continue to emit noxious odors, toxic fumes, and airborne pollutants into the surrounding community.

99.     Defendants' operations have created an ongoing and unreasonable interference with the community's right to breathe clean air, enjoy safe outdoor spaces, and live free from toxic emissions.

100.    As a result of Defendants' conduct, Plaintiffs have been continually exposed to toxic air pollution, which has caused and continues to cause breathing difficulties, burning of the eyes and throat, headaches, fatigue, and increased risk of cancer and respiratory illness.  These are personal injuries to plaintiffs that are different in kind than those suffered by other members of the public.

101.    Plaintiffs cannot open their windows or spend time outdoors without suffering exposure to these pollutants and foul odors.

102.    The presence of these pollutants and odors has substantially interfered with Plaintiffs' quiet use and enjoyment of their properties, causing discomfort, emotional distress, and a decline in property value.

28

103.    Plaintiffs did not consent to Defendants' emissions or to the invasion of their properties by pollutants and odors.

104.    An ordinary person would be reasonably annoyed and disturbed by such conditions.

105.    Defendants' actions and inactions were a substantial factor in causing Plaintiffs' harm, including property damage, physical injury, mental anguish, loss of quiet enjoyment, and emotional distress.

106.    The seriousness of the harm Defendants caused Plaintiffs outweighs any public benefit that Defendants may provide.

## COUNT III – MEDICAL MONITORING
(against all defendants)

107.    All previous paragraphs are incorporated into this count.

108.    Defendants owed a general duty to exercise reasonable care in preventing foreseeable harm to Plaintiffs. The defendants knew or should have known that the exposure to pollutants Defendants emit created a risk of adverse devastating health consequences described in this complaint.

109.    Plaintiffs' exposure to sulfur dioxide, nitrogen oxides, particulate matter, ammonia, and BTEX compounds has placed them at a significantly increased risk of developing serious latent diseases, including but not limited to lung cancer, leukemia, non-Hodgkin lymphoma, cardiovascular disease, COPD, chronic bronchitis, and asthma.

110.    Monitoring procedures enable the early detection of cancers, respiratory disorders, cardiovascular disease, and other early indicators of pollutant-related illness. Individuals exposed to hazardous air pollutants such as benzene, BTEX compounds, particulate matter, ammonia, sulfur dioxide, and nitrogen oxides require health surveillance that differs substantially from that recommended for unexposed populations. Because these pollutants are associated with increased

29

risks of leukemia, non-Hodgkin's lymphoma, lung cancer, COPD, chronic bronchitis, asthma, and other latent or progressive diseases, exposed individuals require periodic, specialized medical monitoring. Such monitoring is medically necessary for the Plaintiffs because the general population does not undergo this level of evaluation absent hazardous environmental exposure. Early detection materially improves treatment outcomes, reduces morbidity and mortality, and allows for timely medical intervention that would not otherwise be indicated but for Defendants' ongoing releases of carcinogenic and respiratory-toxic pollutants. Accordingly, a court-supervised medical monitoring program is essential to safeguard the health of residents who have been continuously exposed to Defendants' emissions

111.    Accordingly, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs. The medical monitoring program should include comprehensive diagnostic testing such as pulmonary function testing, cancer-screening protocols, biomarker analysis for BTEX and ammonia exposure, and other appropriate examinations—to facilitate early detection and treatment of pollutant-related disease. The program should be funded through a Court-supervised trust to ensure that Plaintiffs receive monitoring as frequently and comprehensively as medically necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, as the representative of the Class described herein, and on behalf of the Plan, prays for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C.    Against Defendant and in favor of Plaintiffs and all members of the Class for damages, including special damages and punitive damages, according to proof, plus

pre-judgment and post-judgment interest, for the improper and wrongful acts that are the subject of this action;

D. Grant relief to Plaintiffs and the Class in the form of a medical monitoring program to be funded by Defendants;

E. An award of pre-judgment interest;

F. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

G. An award of such other and further relief as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs request a trial by jury on all issues properly triable by jury in this action.

## **PLACE OF TRIAL**

Plaintiff designates Topeka, Kansas as the place of trial.

31

Dated: March 27, 2026                    */s/ Daniel Shane Bangerter*
                                         Daniel Shane Bangerter SC 14527
                                         **BANGERTER LAW, P.A.**
                                         P.O. Box 1118
                                         Dodge City, KS 67801
                                         Tel: (620) 339-4115
                                         Fax: (620) 682-9959
                                         shane@blawpa.com
                                         *Counsel for Plaintiff*