**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| John Vest, Margaret Culton, and William Yates, individually and as the representatives of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CVR Energy, Inc., CVR Partners, LP, Coffeyville Resources Nitrogen Fertilizers, LLC, Coffeyville Resources Refining & Marketing, LLC,<br><br>Defendants. | Case No.: 5:26-cv-04011-KHV-TJJ |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' CVR ENERGY, INC.,**
**AND CVR PARTNERS, LP'S MOTION TO DISMISS**

**INTRODUCTION**

CVR Energy, Inc. and CVR Partners, LP (together, "the Parent Defendants") face allegations that their use of the corporate form has resulted in injustice to Plaintiffs and their community. The injustice is structural. For years, the refinery and fertilizer facility they control have inflicted devastating damage to the quality of life, property, and health of the surrounding community — releasing documented carcinogens and respiratory toxins, including BTEX compounds, ammonia, sulfur dioxide, nitrogen oxides, and particulate matter, in continued violations of the Clean Air Act at levels the EPA has repeatedly designated as High Priority Violations. But when it comes to liability, it is formally housed in the subsidiaries Coffeyville Resources Nitrogen Fertilizers, LLC (CRNF) and Coffeyville Resources Refining & Marketing, LLC (CRRM) — entities that are tightly controlled by the Parent Defendants through shared

executives, shared services, and a unified operational and financial infrastructure that the Factual Background details below.

Indeed, Plaintiffs raise genuine questions as to whether these entities are even equipped to compensate Plaintiffs for the vast harm they have caused — and they do so on the basis of what is publicly available, which is itself limited. CRNF and CRRM are privately held entities. Publicly available information regarding their financial condition, corporate control, governance, and operational independence is constrained. Yet even from what can be gleaned from public disclosures, the picture is telling: CRNF required a $45 million parental guarantee to secure its own performance obligations to third parties — an inference that it could not stand behind those commitments alone. CRNF depends on its sister entity CRRM for its primary production input at pricing set by an internal formula rather than the open market. And CRRM, for its part, sells its entire petroleum coke output into that same affiliated relationship. These are not the financial hallmarks of independent enterprises — and they raise genuine questions about whether CRNF and CRRM are capable of bearing the full consequences of what this complex has done to Coffeyville. The information necessary to answer those questions fully is in Defendants' exclusive possession.

This structural injustice is sufficient to pierce the corporate veil under Kansas law. Defendants' attempt to import a Delaware standard requiring a showing of "fraud or something like it" but Delaware law does not govern, and Kansas law has never required fraud as a precondition to veil piercing. Kansas law asks whether recognition of the corporate separation would result in injustice to third parties — and on these facts, at the pleading stage, that question cannot be resolved against Plaintiffs on a motion to dismiss.

## FACTUAL BACKGROUND

CVR Energy is a holding company that owns and controls CVR Partners, which in turn wholly owns CRNF and indirectly wholly owns CRRM. (FAC ¶¶ 14–17). CVR Energy formed CVR Partners to own, operate, and grow its nitrogen fertilizer business. (FAC ¶ 15). The Parent Defendants exercise tight domination over their subsidiaries. CVR Energy's own Form 10-K confirms that it directs and controls CVR Partners' management and business operations in their entirety, including the election and appointment of directors, business strategy, mergers, acquisitions, and the payment of distributions. (FAC ¶ 22). CVR Services, LLC — a CVR Energy subsidiary — provides operational and administrative services across all four entities under a single master services agreement, including oversight of environmental, health, safety, and security functions at the facilities giving rise to this lawsuit. (FAC ¶¶ 23–24). The same executives sign as officers of multiple entities: Mark Pytosh signed the Corporate MSA simultaneously as President and CEO of CVR Partners and as President and CEO of CRNF; Tracy Jackson signed as EVP and CFO of CVR Energy and as EVP and CFO of CRRM. (FAC ¶ 25).

What operates on the ground in Coffeyville is a single industrial complex that the Parent Defendants have formally split into two corporate entities. A refinery and a fertilizer plant are linked by perpetual easements for a conveyor belt system and coke haul road granted by CRRM to CRNF for the transportation of petroleum coke between the two facilities. (FAC ¶ 29). CRNF is contractually obligated to purchase up to 500,000 tons of petroleum coke produced by CRRM pursuant to an internal pricing formula. (FAC ¶ 27). CVR Partners has itself publicly disclosed that it purchases all petroleum coke produced by CRRM, and that any disruption to that supply would require open-market purchases at potentially higher prices. (FAC ¶ 28). Beyond these operational dependencies, CVR Partners has put its own financial weight behind CRNF's

3

obligations — issuing a guarantee of up to $45 million to secure CRNF's performance obligations to third parties. (FAC ¶ 26).

Plaintiffs and the community surrounding these facilities have endured years of unlawful emissions at EPA High Priority Violation levels. Plaintiffs allege devastating harm across property, health, and quality of life. Homes and vehicles bear the visible marks of sustained toxic exposure — black deposits, stripped paint, corroded surfaces. Residents report respiratory symptoms, burning eyes and throats, dizziness, headaches, and fatigue. Plaintiffs and the broader community face significantly elevated risks of cancer and chronic respiratory disease. (FAC ¶¶ 74–76, 88–91, 98–102). The documented toll on the broader community is severe: cancer mortality in Montgomery County runs up to 14.2% above the Kansas average, COPD rates in Coffeyville stand at more than twice the national average, and life expectancy is nearly three years below the statewide mean. (FAC ¶¶ 69–73).

## ARGUMENT

### I.   Standard of Review.

On a motion to dismiss under Rule 12(b)(6), the Court accepts all wellpleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint need not provide detailed factual allegations; it need only contain sufficient factual matter to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Whether the plaintiff can ultimately prove its allegations is not the question at this stage—a well-pleaded complaint may proceed even if recovery appears remote and unlikely. *Id.* at 556.

### II.   Kansas Law Governs the Liability of the Parent Defendants.

Kansas choice of law rules provide that tort actions are governed by the law of the state where the tort occurred. *Nordwald v. Brightlink Commc'ns, LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022). The torts at issue occurred in Kansas, inflicted on Kansas residents by facilities operating in Kansas. Kansas law applies to the issue of veil piercing.

Defendants argue that the law of the state of incorporation always governs veil-piercing claims against foreign corporations, citing *Blalock v. SRKBS Hotel*, LLC, No. 21-2552, 2023 WL 2734226 (D. Kan. Mar. 31, 2023), and *Teran v. GB* International, S.P.A., 920 F. Supp. 2d 1176 (D. Kan. 2013), which in turn cites *Consol. Beef Indus., Inc. v. Schuyler*, 716 P.2d 544 (Kan. 1986). None of these cases establishes such a sweeping rule, certainly not in the context of claims brought by Kansas residents against a parent defendant whose subsidiary caused harm in Kansas. *Consol. Beef* did not involve veil-piercing at all — it concerned officers of a defunct Missouri corporation held liable as statutory trustees under Missouri's own dissolution statute, a pure question of internal corporate governance. *Teran* likewise was not a veil-piercing case. It involved a dispute between shareholders of a corporation, and the court applied the law of incorporation only because, as it expressly stated, the plaintiff's tort claims were "based on the purported mis-governance of ACTP, a Missouri corporation" — and not, the court was careful to note, to its general tort conflicts of law rule. Finally, in Blalock the LLC was organized in Kansas, the tort occurred in Kansas, and diversity existed only because the plaintiff was a Missouri citizen. There was no occasion to resolve which state's law governed veil-piercing against a foreign entity.

The proposed rule also runs in tension with Kansas veil piercing jurisprudence which centers on whether recognizing the corporate separation would result in injustice to third parties. *Doughty v. CSX Transp., Inc.*, 905 P.2d 106, 111 (Kan. 1995). That inquiry is broader than anything the internal affairs doctrine addresses — it was designed precisely for cases like this one,

where members of the public who never contracted with the corporation, never negotiated its governance structure, and never had any say in its state of incorporation are left bearing the consequences of what the enterprise did.

### III.    Plaintiffs Have Adequately Alleged Domination Under Kansas Law.

The domination inquiry under Kansas law is not a mechanical checklist. It is a fact-intensive determination based on the totality of the relationship between parent and subsidiary. *Doughty v. CSX Transp., Inc.*, 905 P.2d 106, 111 (Kan. 1995); *Cyprus Amax Minerals Co. v. TCI Pacific Communications, LLC*, 28 F.4th 996, 1007 (10th Cir. 2022).

Kansas courts consider ten factors as guidelines: "whether: (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed." *Cyprus Amax,* 28 F.4th at 1007. These factors are guidelines only — no single factor or combination is necessarily conclusive. They are not tallied but considered as a whole, with due regard to the extent to which each was and was not fully satisfied. *Id*.

Applied here, the allegations in the Amended Complaint satisfy multiple factors directly and support reasonable inferences as to others, establishing a plausible claim of domination:

**Factor 1 — Ownership**. CVR Partners wholly owns CRNF. CVR Energy indirectly wholly owns CRRM. (FAC ¶¶ 16–17).

**Factor 2 — Common officers.** Mark Pytosh signed the Corporate MSA simultaneously as President and CEO of CVR Partners and as President and CEO of CRNF. Tracy Jackson signed as EVP and CFO of CVR Energy and as EVP and CFO of CRRM. (FAC ¶ 25). When the same individuals simultaneously occupy the senior executive roles at both the parent and the subsidiary, the subsidiary has no independent leadership capable of acting adverse to the parent's interests.

**Factor 3 — Parental financing.** CVR Partners issued a guarantee of up to $45 million on behalf of CRNF to secure CRNF's performance obligations to third parties. (FAC ¶ 26). A parent that stands behind its subsidiary's commercial obligations with its own financial commitment is financing that subsidiary in the most direct sense.

**Factor 4 — Caused incorporation.** CVR Energy formed CVR Partners expressly to own, operate, and grow its nitrogen fertilizer business. (FAC ¶ 15). CVR Partners is the sole member of both CRNF and CRRM. The operating entities at the center of this litigation exist because the Parent Defendants caused them to exist, for the Parent Defendants' purposes.

**Factor 5 — Inadequate capitalization.** Plaintiffs raise genuine questions about the financial adequacy of the lower-tier entities — and they do so on the basis of what is publicly available, which is itself limited. CRNF and CRRM are privately held entities. Publicly available information regarding their financial condition, corporate control, governance, and operational independence is constrained. Yet even from what can be gleaned from public disclosures, the picture is telling. CRNF required a $45 million parental guarantee to secure its own performance

obligations to third parties — raising a fair inference that it could not stand behind those commitments on its own. (FAC ¶ 26). Moreover, the available facts support a reasonable inference that CRNF's operations depend on affiliated supply arrangements whose pricing and terms are not determined in an open market. CRNF is contractually obligated to purchase up to 500,000 tons of petroleum coke produced by CRRM pursuant to an internal pricing formula. (FAC ¶ 27). CVR Partners has itself publicly disclosed that it purchases all petroleum coke produced by CRRM, and that any disruption to that supply would require open-market purchases at potentially higher prices. (FAC ¶ 28).

**Factor 9 — Direction of operations.** CVR Energy's own Form 10-K confirms it directs and controls CVR Partners' management and business operations in their entirety, including the election and appointment of directors, business strategy, mergers, acquisitions, and the payment of distributions. (FAC ¶ 22). CVR Services, LLC — a CVR Energy subsidiary — provides centralized operational and administrative personnel to all four entities under a single master services agreement, including oversight of environmental, health, safety, and security functions at the facilities giving rise to this lawsuit. (FAC ¶¶ 23–24). The shared personnel use centralized systems across all four entities and are not dedicated to any single one. (FAC ¶ 24). These arrangements support a reasonable inference that the directors and executives of the lower-tier entities do not act independently in their own interests, but instead take direction from Parent Defendants.

Taken together, these allegations — 100% ownership, identical senior executives, parental financial backing, parent-caused corporate structure, questions of financial adequacy, and parent-directed operations — present a plausible and well-supported claim of domination that cannot be resolved against Plaintiffs on a motion to dismiss.

**IV.    Plaintiffs Have Adequately Alleged Injustice to Third Parties Under Kansas Law.**

Defendants argue that dismissal is appropriate because Plaintiffs fail to allege malfeasance or undercapitalization. But the Tenth Circuit has made clear that Kansas law takes a broader view of injustice in veil-piercing cases.

> There is no need to show that NJZ or TFMC abused the corporate form specifically to avoid *this* lawsuit, or even lawsuits involving Cyprus or CERCLA actions more generally. **To be sure, purposeful undercapitalization to avoid a potential judgment is "the principal injustice that might lead a court to disregard the separateness of affiliated entities." But nothing in the caselaw indicates that it is the only injustice that can support piercing the corporate veil. Indeed, the Kansas Supreme Court has phrased the injustice question as whether "recognition of the subsidiary as a distinct entity *would result* in an injustice to *third parties*."** *Cyprus Amax*, 28 F.4th at 1008 (citations omitted).

The injustice here is structural. A single industrial complex whose operations have caused documented harm to the health and property of thousands of Coffeyville residents has been formally divided into two corporate entities — privately held, with constrained public visibility into their financial condition and ability to compensate for that harm. (FAC ¶ 21 n.1). The publicly available record raises genuine questions about the financial capacity of these entities to satisfy a judgment of the magnitude this litigation may require. CRNF required a $45 million parental guarantee simply to meet its performance obligations to third parties — raising genuine questions about its independent financial capacity. (FAC ¶ 26). Its primary production input flows from a sister entity at pricing set by an internal formula rather than the open market. (FAC ¶ 27). CRRM, for its part, sells its petroleum coke output into that same captive relationship. (FAC ¶ 28). The profits generated by this integrated complex flow upward to the Parent Defendants; the liability stays below, concentrated in entities whose financial adequacy is genuinely in question and whose

9

books are not public. That is the architecture of injustice that Kansas veil-piercing doctrine exists to address. From these allegations, injustice can be inferred. Dismissal on a motion to dismiss would be inappropriate.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the claims against CVR Energy and CVR Partners should be denied.

Dated: April 27, 2026

*/s/ Daniel Shane Bangerter*
Daniel Shane Bangerter SC 14527
**BANGERTER LAW, P.A.**
P.O. Box 1118
Dodge City, KS 67801
Tel: (620) 339-4115
Fax: (620) 682-9959
shane@blawpa.com

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

*Counsel for Plaintiffs*